**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

WILLIAM BRADLEY, *et al.*,

Plaintiffs,

v.

UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, *et al.*,

Defendants.

Civil Action No. 1:26-cv-00950-RC

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

Introduction ........ 1

Factual Background ........ 5

Standard of Review ........ 7

I. FED. R. CIV. P. 12(b)(1) ........ 7

II. FED. R. CIV. P. 12(b)(6) ........ 9

Argument ........ 10

I. The Court has jurisdiction over all of Plaintiffs' claims against non-USAID Defendants and all claims alleging adverse employment actions occurring before April 24, 2025 ........ 10

A. *Plaintiffs have standing to sue the State Department, OPM, OMB, and DOGE Defendants* ........ 10

B. *Plaintiffs' adverse employment action claims are timely* ........ 18

II. Plaintiffs have stated claims as to all counts under FED. R. CIV. P. 12(b)(6). ........ 22

*A. Plaintiffs have made a plausible disparate treatment ADEA claim in Count One.* ........ 22

*B. Plaintiffs have set forth plausible disparate impact ADEA claims in Count Two.* ........ 25

*C. Count Five states a Constructive Discharge claim under the ADEA.* ........ 27

*D. Count Three states a claim under the OWBPA.* .......................................................... 28

*E. Count Six alleging a violation of the ALA both sets forth a cause of action and is Independent Evidence of Discrimination, Retaliation, and Reprisal.* .................................... 30

*F. Count Seven states a claim under the APA.* ................................................................ 32

Conclusion ........................................................................................................................ 34

# TABLE OF AUTHORITIES

**Cases**

*Alberti v. District of Columbia*, 2026 U.S. Dist. LEXIS 152132, *20 (D. D.C. 2026) ................ 22

*Alma v. Bowser*, 159 F.Supp.3d 1, 3 (D. D.C. 2016)........................................................................ 9

*Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)..................................... 7, 8, 9

*Anzueto v. Wash. Metro. Area Transit*, 357 F.Supp.2d 27, (D. D.C. 2004) ................................ 28

*Arnold v. U.S. Postal Svce,*, 863 F.2d 994, 998 (D.C. Cir. 1988)................................................ 26

*Artis v. Bernanke*, 630 F.3d 1031, 1034 n.4 (D.C. Cir. 2011) ...................................................... 20

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ................................................................................... 9

*Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)................................................................ 12

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)........................................................... 10

*Bennett v. Spear*, 520 U.S. 154, 178 (1997) ........................................................................... 32, 33

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.,* 972 F.3d 83, 115 (D.C. Cir. 2020) ........................................................................................................................................... 32

*Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 656 (2020) ..................................................... 17, 18

*Bread for the City, Inc. v. U.S. Dep't of Agric., et al.*, 211 F.Supp.3d 327, 329-30 (D.D.C. 2016)9

*Breen v. Chao*, 253 F.Supp.3d 244, 253-254 (D. D.C. 2017)...................................................... 22

*Burlison v. McDonald's Corp*., 455 F.3d 1242 (11th Cir. 2006).................................................. 33

*Campbell v. Amana Co., L.P*., 125 F.Supp.2d 1129, 1134 (D. Ia. 2001) .................................... 29

*Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017)..................................... 10, 11

*Chambers v. District of Columbia*, 35 F.4th 870, 876-77 (D.C. Cir. 2022) ................................ 12

*Cigar Ass'n of Am. v. U.S. Fed. & Drug Admin.*, 964 F.3d 56, 61 (D.C. Cir. 2020) ............. 32, 33

*Ctr. for Biological Diversity v. Zinke, et al.*, 369 F.Supp.3d 164, 172 (D. D.C. 2019).............. 7, 9

*Dahlia v. Rodriguez*, 735 F.3d 1060, 1063 (9th Cir. 2013) ......................................................... 19

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) .......................... 32

*Doe v. Musk*, 2025 U.S. Dist. LEXIS 157111, *50-51 (D. Md. 2025) ........................................ 12

*Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 92 (D. D.C. 2025) .......................................... 25

*Ford v. Mabus*, 629 F.3d 198 (D.C. Cir. 2010) ............................................................................ 11

*Gill v. District of Columbia*, 872 F.Supp.2d 30, 34 (D. D.C. 2012) ............................................. 9

*Gilvin v. Fire*, 259 F.3d 749, 756 (D.C. Cir. 2001) ..................................................................... 10

*Glob. Health Council v. Trump*, 153 F.4th 1, n. 5 (D.C. Cir. 2025 ............................................. 13

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) .......................................................... 23

*Gunn v. Minton*, 568 U.S. 251, 256 (2013)................................................................................... 7

*In Re: Administrative Subpoena 25-1431-032 to Rhode Island Hospital*, C.A. No. 1:26-mc-0007-MSM-AEM, 2026 U.S. Dist. LEXIS 106783, 2026 WL 1463692 at *2-3( D. R.I. May 14, 2026) .......................................................................................................................................... 24

*Kareen v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021) ............................................................... 11

*King v. Aramark Servs.*, 96 F.4th 546, 559-60 (2d Cir. 2024)...................................................... 22

*Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375.377 (1994) ................................. 7

*Kucinich v. Bush*, 236 F.Supp. 2d 1, 4 (D. D.C. 2002)................................................................ 11

*Larsen v. Simonds Indus.*, 227 F.Supp.2d 331, 337 (D. Ma. 2004)............................................. 28

*Leftwich v. Harris-Stowe State College*, 702 F.2d 686, 690 (8th Cir. 1983)............................... 26

*Lipscomb v. Raddatz Law Firm, P.L.L.C.*, 109 F. Supp. 3d 251, 255-256 (D. D.C. 2015).......... 10

*Lucas v. AFGE*, 151 F.4th 370, 384 (D.C. Cir. 2025) ................................................................. 32

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) ...................................................... 11

*Mamantov v. Jackson*, 898 F.Supp. 2d 121, 127 (D. D.C. 2012) ................................................ 11

*McMunn v. Vill. of Quogue*, 2026 U.S. Dist. LEXIS 152132, *5-6 (E.D. N.Y. 2026)........... 17, 18

*Montgomery v. Omnisec Int'l Sec. Servs.*, 961 F.Supp.2d 178, 182 (D.D.C. 2013)....................... 9

*Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 355 (2024) ...................................................... 12

*Newman v. D.C. Courts*, 125 F. Supp. 3d 95, 106 (D.C. Cir. 2015)............................................ 29

*Niskey v. Kelly*, 859 F.3d 1, 7 (D.C. Cir. 2017) ............................................................................ 20

*Oubre v. Entergy Operations*, 522 U.S. 422, 428 (1998) .................... 29, 30

*Peterson v. Seagate US LLC*, 2007 U.S. Dist. LEXIS 85873, *8 (D. Mn. 2007).................... 28

*Powell v. Omnicom*, 497 F.3d 124 (2d Cir. 2007) .................... 33

*Proctor v. District of Columbia, et al.*, 74 F.Supp.3d 436, 445 (D. D.C. 2014).................... 7, 8

*Rahimi v. Weinstein*, 271 F.Supp.3d 98, 102-3 (D. D.C. 2017).................... 20

*Reeve v. Monex Inc.*, 2024 U.S. Dist. LEXIS 133053, *20 (D. D.C. 2024) .................... 22

*Richardson v. Nat'l R.R. Passenger Corp.*, 2025 U.S. Dist. LEXIS 105242, *14 (D. D.C. 2025) .................... 12

*Roberson v. Snow*, 404 F.Supp.2d 79, 97 (D. D.C. 2005) .................... 21

*See Jones v. SEPTA*, 796 F.3d 323, 324 (3d Cir. 2015).................... 19

*Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 891 (8th Cir. 2005).................... 19

*Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) .................... 25

*Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).................... 9, 10

*Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011) .................... 17

*Stewart v. Miss. Transp. Comm'n*, 586 F3d 321, 332 (5th Cir. 2009).................... 19

*U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1217 (D.C. Cir. 1993) .................... 7

*United States v. Oregon*, No. 6:25-CV-01666-MTK, 2026 U.S. Dist. LEXIS 25259, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026).................... 24

*Vickers v. Powell*, 493 F.3d 186, 198 (D.C. Cir.) .................... 22

*Wevodau v. Pennsylvania*, 227 F. Supp.3d 404, 408 (M. D. Pa. 2017).................... 19

*Whitehead v. Oklahoma Gas & Elec. Co.*, 187 F.3d 1184, 1192 (10th Cir. 1999).................... 21, 28, 30

**Statutes**

29 U.S.C. § 621, *et seq*.................... 2

29 U.S.C. § 623.................... 31

29 U.S.C. § 626.................... 2, 6, 21, 40

29 U.S.C. § 633a .................... 27, 30

5 U.S.C. § 6329a ........ 2, 36

5 U.S.C. §§702 ........ 39

5 U.S.C. §704 ........ 38

5 U.S.C. §706(2)(D) ........ 38

**Other Authorities**

Executive Order 14158, *Establishing and Implementing the President's "Department of Government Efficiency"* ........ 5

Executive Order 14210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative* ........ 5, 17

**Regulations**

29 C.F.R. § 1614.201 ........ 7, 21

29 C.F.R. § 1625.22 ........ 35

5 C.F.R. § 351.501 ........ 4

5 C.F.R. § 630.1403 ........ 36, 37

Plaintiffs, by and through undersigned counsel, respectfully submit this Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss ("MTD") (Dkt. No. 14).

## INTRODUCTION

Largely ignoring the facts and allegations in the First Amended Complaint ("FAC") (Dkt. No. 7) and the standards of a 12(b)(1) and 12(b)(6) motion, Defendants seek to dismiss all counts in the FAC based on a jaundiced view of the facts concerning Plaintiffs' removal from federal service. Indeed, their MTD consists primarily of affirmative defenses, which should be pled in an answer and for which discovery and not dismissal is appropriate. This removal denied Plaintiffs seniority and age-related benefits and failed to comply with federal law. Defendants also ignore the various admissions that Defendants' actions against Plaintiffs were part of some generational struggle between agents of the incoming Administration, who are largely youthful, sometimes adolescent, employees and the "dinosaurs" that occupied the civil and foreign service, who like their namesake needed to accept the extinction events Defendants engineered.

As the FAC makes clear, in early 2025, Defendants sought to terminate USAID personnel to address "the geriatric, the kind of nursing home regime that has been pushing the country into oblivion." FAC at ¶ 219. This and other ageist comments, cited in paragraphs 216, 217-219, 221, 222, 228, 230 of the FAC, are ignored and excused by Defendants, who assert that the entirety of the Agency was subject to destruction and, thus, age could not have been the determinative factor in the removal of Plaintiffs from federal service. In other words, although there are ample statements of direct age-based discrimination in the decision to remove Plaintiffs, *see* FAC at ¶¶ 18-21, 214-239, 241-247, 252-254, 258, 268-271, 279-282, 291-301, 310, 317-322, 325, 330-335, 338-348, 350, 354, Defendants argue these statements are not probative because they illegally destroyed the agency as a whole. Indeed, Defendants argue that

since their ultimately illegal destruction of USAID was complete, they could not have acted on discriminatory motives based on age. The Defendants seem to argue that because they may have committed separate and more draconian violations of federal law against all federal employees, that these defeat any more specific claims arising under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq*.[1]

The factual dispute in this case is – whether by design or impact – Defendants took actions against Plaintiffs that violated the protections of the ADEA. At its core, the FAC painstakingly outlines actual statements of Defendants and their agents that establish age as a motivation for the various actions cited in the FAC. The FAC also highlights how Defendants simply ignored statutory and regulatory schemes applicable to older workers facing termination. It further highlights how Defendants abused involuntary administrative leave in violation of the Administrative Leave Act ("ALA"), 5 U.S.C. § 6329a, and both failed to advise older workers of their rights and tried to entice them into surrendering their rights, in violation of the Older Workers Benefits Program Act ("OWBPA"), 29 U.S.C. § 626. The FAC also illustrates how Defendants shifted the duties of older USAID workers to the State Department and then blocked the older employees from pursuing the new positions or advertised those positions at lower pay, seniority, and benefits. Finally, the FAC outlines how Defendants abolished the mechanisms by which older workers might learn of, defend, or appeal the denial of their rights.

Rather than argue the law, Defendants ignore factual pleadings in the FAC that establish

[1] The Defendants' theory is rather cynical. *USAID DEIA RIF Consolidation v. U.S. Agency for International Development*, MSPB Docket No. CF-0351-26-0004-I-1 (Jan. 20, 2026) (Agency File, Tab C-11 at 12-14), now pending before the Merit Systems Protection Board, the Defendants have argued that the RIF was proper and was not based on improper political motivations. But, if the RIF is in some way legitimate under existing regulations, set forth at 5 CFR § 351, then the issue of whether it ignored age related procedures is relevant. If Defendants are admitting that the RIF was itself illegal, an age claim is not precluded because the illegal act could still be targeted at older workers. Exacerbating the extent of the misconduct to violate the rights of all USAID employees is not a defense to an age claim. Further, such a claim is an affirmative defense to the FAC, which is factual, not legal, in nature.

plausible claims for relief and broadly declare, with no support, that Plaintiffs claims against non-USAID Defendants must be dismissed pursuant to Rule 12(b)(1). Furthermore, in defiance of Rule 12(b)(6), Defendants merely create their own unsupported factual narrative that also ignores the FAC's well-pled facts. This ruse should be rejected, lest Defendants intend to convert their motion to a Rule 56 Motion for Summary Judgment, and the MTD should be denied.

The FAC provides a well-pled factual statement that beginning in January 2025, Defendants sought to shutter virtually all of USAID functions, notifying USAID employees that the State Department would assume responsibility for the administration of USAID's surviving functions. FAC at ¶ 303. As part of this defenestration, Defendants, at great expense to the American taxpayer and without the slightest logic, procedural support, or clear explanation, placed most of USAID's foreign service officers on an extended and indefinite paid leave status. This was done in direct defiance to the clear and specific 2025 changes to the ALA's implementing regulations, which expressly precluded that abuse of enforced leave in the manner employed by the Agency and Defendants. FAC at ¶ 286. As the FAC notes, Defendants also deployed a specious and illegal "Fork in the Road" ruse that was strikingly similar to Mr. Musk's actions in his private sector mass terminations, and that was designed to terrorize older workers into leaving USAID while surrendering all their appellate rights on a vague and unenforceable promise to pay them for several months to not work at all. FAC at ¶¶ 267, 269.

Further, Defendants had actual knowledge that their actions were designed to drive older employees from USAID and the federal government. FAC ¶ 2-9, 17-21, 292, 306, 307, 310, 316, 320, 328, 332, 344, 364. The Defendants conducted an alleged Reduction in Force ("RIF")

that gave no procedural protections to older, more senior employees. [2] As the FAC points out, Defendants ignored the need for RIF retention registers. FAC at ¶¶ 6., 308-312. Retention registers are created for each competitive level and rank employees based on tenure, veterans' preference, length of service, and performance ratings. These factors are applied to protect the knowledge and seniority of workers subject to RIF. *See* 5 C.F.R. § 351.501, *Order of retention—competitive service* ("Competing employees shall be classified on a retention register on the basis of their tenure of employment, veteran preference, length of service, and performance in descending order as follows: (1) By tenure group I, group II, group III; and (2) Within each group by veteran preference subgroup AD, subgroup A, subgroup B; and(3) Within each subgroup by years of service as augmented by credit for performance under § 351.504, beginning with the earliest service date.)[3] But as the Complaint details, Defendants ignored retention registers altogether and, with the adolescent workforce that was DOGE, reviewed USAID employees' Social Security data while conducting the terminations giving rise to this suit. FAC at ¶ 217.

After Defendants dismantled most of USAID, the State Department assumed direct control over USAID and its functions and began hiring younger employees for positions previously held by Plaintiffs and other older USAID employees. FAC at ¶¶ 4, 214, 218, 239, 255, 256, 313. In implementing the DRP and RIF, Defendants failed to publish data related to the RIF's decisional group, counsel employees on the DRP, or otherwise adequately notify employees of their rights, as required by OWBPA. As direct evidence of the age-related basis for their actions, Defendants

[2] See 5 U.S. Code § 3502(a).

[3] OPM has issued a rule that would reduce the primacy of seniority in RIFs. Whether this action is legal and not violative of the ADEA is not part of this action and the revised regulations have yet to take effect. *See* OPM Published Document: 2026-15665 (91 FR 49178) (Effective August 3, 2026). However, the acknowledgement that seniority was the primary factor in evaluating RIF's supports the idea that seniority and tenure in the federal service are protected classes that clearly correlate to age.

publicly made derogatory statements about the age of USAID and career federal employees and touted the youthful "Gen Z, millennial takeover of the federal government." FAC at ¶ 219. Despite these clear, well-pled, well-supported allegations, Defendants contend there is nothing to see here, while offering specious fact and legal based claims to support their motion.

## FACTUAL BACKGROUND[4]

On January 20, 2025, the Executive Office of the President issued Executive Order 14158, *Establishing and Implementing the President's "Department of Government Efficiency"* that created Defendant U.S. Department of Government Efficiency Service ("DOGE"). FAC at ¶ 205. By early February 2025, Defendants began to implement a plan to terminate the employment of USAID's foreign service officers, most of whom are over the age of forty. On February 11, 2025, Executive Order 14210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, directed DOGE, OPM, OMB, and agency heads to "promptly undertake preparations to initiate large-scale reductions in force (RIFs)[,]" and adolescent DOGE employees assumed senior roles at the State Department. FAC at ¶¶ 230, 236.

Upon assuming their State Department roles, these DOGE employees coordinated with Defendants to implement mass terminations and forced retirements at USAID. FAC at ¶¶ 214, 217. To that end, Defendants reviewed federal workers' social security data, which has age-related information, FAC at ¶ 217, and in or around late January 2025 began placing USAID foreign service officers on administrative leave without any information about the duration of the leave. FAC at ¶¶ 30 – 203. Between February 2025 and August 2025, Defendants continued to

[4] Each Count is supported by the facts in the FAC. To the extent the Court finds the facts insufficient, the remedy is not to dismiss the Complaint but to allow Plaintiffs leave to amend their FAC.

place most of the Plaintiffs on administrative leave, FAC at ¶¶ 30-203, but also brought some of the Plaintiffs back on duty from administrative leave. FAC at ¶¶ 32, 63, 75, 77, 94, 96, 98, 114-116, 121, 125, 131, 143, 147, 193. While placing Plaintiffs on administrative leave, Defendants were also making public statements about an impending RIF.

While Plaintiffs remained in limbo with most of them denied access to their offices while on an indefinite, extended administrative leave, Defendants created and implemented exit incentives throughout the RIF process, including the Deferred Resignation Program ("DRP"), OPM-approved Voluntary Early Retirement Authority ("VERA"), and other exit incentives, which aimed to induce federal workers, particularly older workers, to resign from federal service. FAC at ¶¶ 7, 259-261, 265-267, 277. In offering the DRP and associated VERA, Defendants did not provide disclosures required by the OWBPA, 29 U.S.C. § 626. FAC at ¶ 280. Defendants also began implementing the RIF in or around March 2025, which has continued through 2026 with some Plaintiffs' employment scheduled to end in September 2026. FAC at ¶¶ 48, 49, 143, 170. The RIF, DRP, VERA, and exit incentives targeted and overwhelmingly affected older workers, with the vast majority of the 154,000 who accepted the offer being at or near retirement age. FAC at ¶ 268.

During the time Defendants were placing employees on administrative leave and announcing the RIF, DRP, and VERA, Defendants were also, through their senior officials, making derogatory statements about federal employees, many of which focused on age. FAC at 222, 228. Additionally, while justifying the RIF based on "lack of work," the State Department was hiring younger workers to perform the jobs Plaintiff had been performing. FAC at ¶ 254. The Defendants' efforts and statements, therefore, stigmatized older federal employees, showing animus based on age.

The Foreign Service Act of 1980 ("FSA") governs the relationship between foreign service officers such as Plaintiffs and their employing agency, USAID and the State Department, and it provides "a comprehensive system for reviewing personnel actions taken against federal employees." *U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1217 (D.C. Cir. 1993). Foreign service officers can bypass this administrative system and seek relief by filing "a civil action in a United States district court under the ADEA against the head of an alleged discriminating agency after giving the [EEOC] not less than 30 days' [written] notice of the intent to file such an action." 29 C.F.R. § 1614.201(a). Plaintiffs elected to bypass the administrative system and filed suit on March 18, 2026, and amended their Complaint on April 9, 2026.

## STANDARD OF REVIEW

### I. FED. R. CIV. P. 12(b)(1)

Defendants have alleged that the Court lacks jurisdiction over all claims arising against non-USAID Defendants and all claims arising from adverse employments actions taken before April 24, 2025. *See* MTD at 7-10. Defendants' theory is that only USAID can be responsible for the actions taken against its own employees, and thus, extending the net of liability to DOGE and other federal actors is improper.

It is true that to survive a Rule 12(b)(1) motion to dismiss, Plaintiffs must allege sufficient facts in their pleading to establish jurisdiction over the putative Defendants. *See Gunn v. Minton*, 568 U.S. 251, 256 (2013); *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994); *Ctr. for Biological Diversity v. Zinke, et al.*, 369 F.Supp.3d 164, 172 (D. D.C. 2019); *Proctor v. District of Columbia, et al.*, 74 F.Supp.3d 436, 445 (D. D.C. 2014); *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011). But Plaintiffs have alleged sufficient facts to establish that the decision to terminate Plaintiffs was not simply an act by USAID leadership.

Indeed, after January 20, 2025, that leadership was largely removed and replaced with a revolving and shadowy set of actors who are alleged to have orchestrated the age-based removals of Plaintiffs. FAC at ¶¶ 205-209, 229, 245, 334. At the core of Plaintiffs' FAC are two simple questions: who took the actions to remove the Plaintiffs and what were their motivations? On the question of who, the FAC merely recites that the agency that placed the Plaintiffs on extended enforced administrative leave and then removed them under a pretextual RIF. Lost on Defendants is the idea that the FAC is replete with citations to the fact that Plaintiffs were kept in the dark as to who was actually making these decisions and why. Plaintiffs' identification of Defendants relies on the known public record that DOGE was instrumental in destroying USAID and that it worked in tandem with officials at the State Department, OPM, and OMB to carry out this act. FAC ¶¶ 205-209, 215-231, 233-238, 242-247, 259-271, 277-285, 288-299, 302-314, 318-322, 324, 328-354. But, contrary to Defendants' position, corporate entities do not actually make decisions, human beings do, and where Defendants consciously cloaked who was actually making decisions and why, it is a bit disingenuous for them to argue that there is no jurisdiction over persons manning entities that may have been involved.

Further, Defendants are merely spouting a counterfactual narrative. However, "[w]hen considering a motion to dismiss under Rule 12(b)(1), the court must accept as true all uncontroverted material factual allegations contained in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged' and upon such facts determine jurisdictional questions." *Proctor*, 74 F.Supp.3d at 446 (quoting *Am. Nat'l Ins. Co.*, 642 F.3d at 1139). The Court is not limited to the allegations in Plaintiffs' FAC and may consider materials outside the pleadings that it deems appropriate to resolve the issue of subject matter jurisdiction. *See Ctr. for Biological Diversity*, 369 F.Supp.3d

at 172 (internal citations omitted). Here any motion to dismiss a Defendant predicated on an assertion that they were not responsible for what occurred is not a jurisdictional issue, but a factual argument. At this stage of the proceedings that should be rejected.

## II. FED. R. CIV. P. 12(b)(6)

Defendants have also asserted that each Count in Plaintiffs' FAC fails to state a claim under Rule 12(b)(6). MTD at 11-18. This, too, is merely a counterfactual projection. Each Count is amply supported by a fact-based allegation. As such, dismissal under Rule 12(b)(6) is improper. The duty of the Court is to "ascertain whether the complaint contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Bread for the City, Inc. v. U.S. Dep't of Agric., et al.*, 211 F.Supp.3d 327, 329-30 (D.D.C. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Montgomery v. Omnisec Int'l Sec. Servs.*, 961 F.Supp.2d 178, 182 (D.D.C. 2013). Factual content is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft,* 556 U.S. at 678 ; *see also Alma v. Bowser*, 159 F.Supp.3d 1, 3 (D. D.C. 2016); *Gill v. District of Columbia*, 872 F.Supp.2d 30, 34 (D. D.C. 2012).

While Plaintiffs must establish more than a mere possibility that Defendants acted unlawfully, the standard is not exacting. Plaintiffs need only show liability is plausible. *See Gill*, 872 F.Supp.2d at 34. To avoid supplanting sufficiency of a factual assertion with proof of that assertion on a Rule 12(b)(6) motion to dismiss, a Court must liberally construe the FAC as a whole and provide Plaintiffs "the benefit of all inferences that can be derived from the facts alleged." *Ctr. for Biological Diversity*, 369 F.Supp.3d at 172 (citations omitted); *see also Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000); *Am. Nat'l Ins. Co.*, 642 F.3d at 1139. A Court must treat "the complaint's factual allegations as true, must grant

plaintiff[s] the benefit of all reasonable inferences from the facts alleged, and may . . . [dismiss] only if 'it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief.'" *Gilvin v. Fire*, 259 F.3d 749, 756 (D.C. Cir. 2001) (quoting *Sparrow*, 216 F3d at 1114).

In other words, Plaintiffs' FAC may survive Defendants' Rule 12(b)(6) MTD "even if 'recovery is very remote and unlikely,' but the facts alleged in the complaint 'must be enough to raise a right to relief above the speculative level.'" *Lipscomb v. Raddatz Law Firm, P.L.L.C.*, 109 F. Supp. 3d 251, 255-256 (D. D.C. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). As set forth in detail below, Plaintiffs' pleading meets this standard.

## ARGUMENT

### I. The Court has jurisdiction over all of Plaintiffs' claims against non-USAID Defendants and all claims alleging adverse employment actions occurring before April 24, 2025.

#### A. *Plaintiffs have standing to sue the State Department, OPM, OMB, and DOGE Defendants.*

Defendants allege that Plaintiffs' agency, USAID, placed them on administrative leave and removed them from federal employment, and Plaintiffs must limit their claims to USAID; thus, Defendants assert that Plaintiffs do not have standing to sue the State Department, DOGE, OPM, and OMB.

Under Article III of the Constitution, federal courts' jurisdiction is limited to "Cases" and Controversies." U.S. Const. Art. III, § 2, cl. 1. This case or controversy requirement demands that Plaintiffs establish standing to sue. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017). To establish Article III standing, Plaintiffs "must allege (i) a 'concrete and particularized' injury that is 'actual or imminent'' (ii) that the injury is caused by the challenged

conduct of the defendant; and (iii) that the requested relief is likely to redress the injury." *Id*. (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *see also Gerlich v. United States*, 659 F.Supp.2d 1, 17 (D. D.C. 2009). When Defendants control the information needed to establish standing, courts allow "pleadings on information and belief accompanied by facts upon which the allegations are based." *See Kareen v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021). Thus, to establish standing, Plaintiffs must first allege they have suffered an injury in fact – an actual or imminent, concrete and particularized violation of a legally protected interest. *See Kucinich v. Bush*, 236 F.Supp. 2d 1, 4 (D. D.C. 2002). Then, Plaintiffs must sufficiently allege that the injury is traceable to Defendants and not the consequence of a third party's independent action. *See id*. Finally, it must be likely, and not speculative, that a favorable decision will remedy the injury. *See id*.

As an initial matter, Defendants' standing argument focuses solely on the second factor of causation and argues that Defendants State Department, OPM, OMB, and DOGE did not *cause* Plaintiffs' injuries. MTD at ¶¶ 7-10. But causation rests on factual proof, that is facts establishing that Defendants' conduct did, in fact, cause Plaintiffs' injuries. *See* Restatement of Torts §§ 9, 431 (1934) ( definition of "legal cause"); *Ford v. Mabus*, 629 F.3d 198 (D.C. Cir. 2010). In so doing, Defendants have conceded that Plaintiffs have suffered an injury in fact and that a favorable decision will provide redress for the injury. Regardless, in the ADEA context an adverse employment action taken because of a plaintiff's age constitutes an injury in fact. *See Mamantov v. Jackson*, 898 F.Supp. 2d 121, 127 (D. D.C. 2012).

Plaintiffs have alleged facts sufficient to show that Defendants took age-based adverse employment actions – including placing Plaintiffs on involuntary administrative leave and terminating Plaintiffs' employment –and that the claimed reasons for these adverse employment

actions were pretextual. FAC at ¶¶ 30-203, 215-222, 228-231, 234-246, 259-271, 291-292. Defendants' actions undisputedly constitute either an actual or imminent injury. *See Chambers v. District of Columbia*, 35 F.4th 870, 876-77 (D.C. Cir. 2022) (rejecting "objectively tangible harm" and "material adversity" requirements for a requirement that plaintiff plead facts sufficient to state a facially plausible discrimination claim); *Richardson v. Nat'l R.R. Passenger Corp.*, 2025 U.S. Dist. LEXIS 105242, *14 (D. D.C. 2025) (quoting *Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 355 (2024)); *Doe v. Musk*, 2025 U.S. Dist. LEXIS 157111, *50-51 (D. Md. 2025) (citing *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)). Similarly, Defendants have not challenged whether the Plaintiffs' injuries are redressable and, thus, have conceded that redress is available. A favorable decision, however, will provide Plaintiffs redress under the ADEA, OWBPA, ALA, and APA.

The only issue Defendants have disputed as to standing is whether Defendants State Department, OPM, OMB, and DOGE *caused* Plaintiffs' injuries. As an initial matter, the FAC clearly specifies the age-based actions all Defendants undertook in concert to implement the unlawful administrative leave, DRP, pretextual RIF, and other adverse employment actions. According to the FAC, Defendants provided no coherent rationale – beyond claiming lack of work – for the pretextual RIF, even though the State Department was, at the same time, hiring younger workers to perform roles Plaintiffs had performed. FAC at ¶¶ 254, 330, 331. The FAC clearly states that the State Department has been using non-competitive and non-transparent hiring mechanisms and "now seeks to rehire and has rehired younger personnel with far less experience, to carry out the same work at State, establishing that Plaintiffs' skills and experience are still needed and therefore their termination was discriminatory." FAC at ¶¶ 337, 338, 343, 344.

The facts alleged in the FAC clearly show that USAID is led by an administrator serving under the guidance of the Secretary of State and that Secretary of State Marco Rubio was the acting USAID Administrator from February through August 2025. FAC at ¶¶ 12, 208; 22 U.S.C. § 6592. Moreover, the facts show that State Department Director of Foreign Assistance Peter Marocco, who was also simultaneously serving as USAID's Acting Deputy Administrator, equated longevity and age to partisan opposition and oversaw the implementation of administrative leave and pretextual RIF in early 2025. FAC at ¶¶ 242, 243; *see also Glob. Health Council v. Trump*, 153 F.4th 1, n. 5 (D.C. Cir. 2025) (noting that "Peter Marocco, then-Director of Foreign Assistance for the Department of State . . . was later removed as a defendant . . . ."). According to the FAC, in early 2025 Marocco began terminating Plaintiffs' employment based on their seniority and longevity at USAID, which was a proxy for age. FAC at ¶ 243.

In March 2025, USAID Deputy Administrator Jeremy Lewin used the electronic mail address usaid_fo@subscribe.usaid.gov to notify Plaintiffs that the State "Department 'will seek to retire USAID's independent operation,' and that the Department will assume responsibility for any Agency program not terminated in full." FAC at ¶ 334. This notice "did not reassign Agency employees and instead informed them that the State Department would conduct its own 'independent hiring process,' only 'available for eligible USAID employees.'" FAC at ¶ 334.

Since early 2025, Lewin has simultaneously held roles in the State Department and USAID. His State Department biography states that, "Lewin has helped to lead the Secretary's historic reform of the wayward foreign assistance apparatus, establish a new Under Secretariat, and manage the realignment of certain former USAID functions to the State Department." *See* U.S. Dep't of State, Biographies, Jeremy P. Lewin, Senior Official, Under Secretary for Foreign Assistance, Humanitarian Affairs, and Religious Freedom, July 11, 2025 – PRESENT.

Additionally, in 2025 Lewin also "served as Deputy Administrator and Chief Operating Officer of USAID, during the period when Secretary Rubio was Acting Administrator of that Agency." *See id*. As such, the Complaint clearly demonstrates that the State Department consolidated USAID under its authority and that State Department officials effected the administrative leave, pretextual RIF, DRP, and other aged-based adverse employment actions.

As to DOGE, Defendants' arguments are self-serving and contrary to what is pled in the FAC itself. The FAC is replete with references to DOGE and the actions of its youthful offenders in helping identify and remove Plaintiffs from employment. To be sure, DOGE's murky role in and questionable authority to participate in the dismantling of USAID and the termination of Plaintiffs' employment is not completely understood at this juncture. This is deliberate and by design. *See* Anna Maria Narry-Jester, *"A Huge Grab of Power": Trump is Defying Congress on Foreign Aid*, ProPublica, June 20, 2026, 5:00 A.M. But what is clear and also set forth in the FAC is that both DOGE and its titular head, Elon Musk, were deeply involved in the termination of Plaintiffs' employment and all other adverse employment actions alleged in the FAC. FAC at 205, 206, 215-224, 228-230, 235-238, 267-269.

Indeed, the crucial issues in the case center on DOGE – what was DOGE's role, under what authority was it operating, and who at DOGE took what steps? Defendants argue that DOGE had no role or authority in the actions against Plaintiffs, but that assertion does not dispute the narrative in the FAC that specifically cites DOGE's involvement. Moreover, that assertion does not comport with the Administration's statements about DOGE. Defendants dodge the issue by simply stating that Plaintiffs cannot prove that DOGE was part of the discriminatory scheme and that DOGE is not a proper Defendant because it was not involved in the actions Plaintiffs allege in their FAC. But that flips the allegation on its head – the FAC seeks evidence and relief related

to the questionable and deliberately obfuscated involvement of DOGE and its participation in the destruction of USAID and pretextual RIF of Plaintiffs.

The FAC further alleges that DOGE was deeply involved in the planning and execution of the administrative leave, pretextual RIF, DRP, and other aged-based adverse employment actions within USAID. At President Trump's direction, the DOGE staff spearheading the efforts to dismantle most of USAID included then-23-year-old Luke Farritor and Edward Coristine, a then-"19-year who's gone by the name 'Big Balls' online" and who served as a senior adviser to the State Department." FAC at ¶¶ 221, 230. Jeremy Lewin's involvement as a State Department and USAID official further demonstrates DOGE's involvement in the actions Plaintiffs have alleged. Initially, Lewin was a DOGE associate who was later appointed to the position Marocco vacated at USAID. *See* Ellen Knickmeyer and Matthew Lee, *DOGE Associate is Made Acting Head of Foreign Assistance at the State Department, a U.S. Official Says*, AP News (April 15, 2025, 4:56 P.M.).

The FAC alleges youth-based messaging within the DOGE team and cited to an article in which Elon Musk "responded to Democratic critics, including those upset about his efforts to push reforms at USAID, saying the 'hysterical reactions' demonstrate the importance of DOGE's work." FAC at ¶ 222. Indeed, President Trump said of DOGE's work inside USAID, "I'll read off a list of 15 or 20 things that they found inside of the USAID. It has to be corrupt." FAC at ¶ 222. Finally, Musk, the titular head of DOGE, has frequently stated his desire to kill USAID and feed it "into the woodchipper." FAC at ¶¶ 237, 238. Thus, the FAC is replete with facts showing DOGE's involvement in the administrative leave, putative RIF, DRP, and other adverse employment actions Plaintiffs have alleged.

Moreover, young DOGE employees at OPM created and published a Fork in the Road letter,

which resembled Musk's letter to employees when he took over Twitter, offering Plaintiffs participation in the DRP, an employment exit incentive targeted at and overwhelmingly affecting older workers. FAC at ¶¶ 267-269. This DOGE-OPM collaboration as alleged in the FAC shows the involvement of both entities in the age-based discriminatory actions that Plaintiffs have alleged. OPM also approved USAID's request to use a VERA that applied only as part of the DRP and also implemented policies related to the ALA that frustrated Congressional intent. FAC at ¶¶ 271, 279, 286-290. The FAC, therefore, clearly demonstrates OPM's role – often in conjunction with DOGE – to implement the aged-based administrative leave, pretextual RIF, DRP, and other adverse employment actions alleged in the FAC.

As to OMB's involvement in the adverse employment actions at issue, Russel Vought, the Director, OMB, has served as the acting USAID Administrator since August 2025. FAC at ¶¶ 208, 209; *see also* Truth Social, SecRubio, August 29, 2025 ("I joked with @realDonaldTrump that I had four jobs. He told me to give one to my friend Russ Vought. So I did. Since January, we've saved the taxpayers tens of billions of dollars. And with a small set of core programs moved over to the State Department, USAID is officially in close out mode. Russ is now at the helm to oversee the closeout of an agency that long ago went off the rails. Congrats, Russ."); Nia Prater, *USAID's Remaining Funds Are Paying for Vought's Security Detail*, NEW YORK MAGAZINE: Intelligencer (Feb. 13, 2026), ("Documents analyzed by Reuters reveal the OMB is directing that $15 million of USAID's remaining operating expenses pay for costs associated with Vought's protection, which is said to consist of more than a dozen members of the U.S. Marshals Service."). OMB Director and Acting USAID Administrator Vought has developed and implemented "the strategy of targeted abuse when he stated that he wished employees such as Plaintiffs to be traumatized: '[W]e want them to not want to go to work because they are

increasingly viewed as the villains.'" FAC at ¶ 354. The FAC, therefore, contains facts sufficient to show that OMB and its Director, who has also served as Acting USAID Director since August 2025, were involved in implementing the lengthy administrative leave, pretextual RIF, DRP, and other adverse employment actions.

The facts alleged in the FAC also demonstrate that all Defendants acted in concert to carry out the adverse employment actions at issue, which were all undertaken as an effort to implement President Trump's Executive Order 14210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative* (Feb. 11, 2025). FAC at ¶¶ 235, 236, 269-271, 279, 286, 288-290. DOGE and its cadre of – literally and figuratively – adolescent employees spearheaded the implementation of this executive order across the federal government. FAC at ¶¶ 215, 216, 218, 219, 230, 235-238, 354. Finally, the Complaint cites Defendants' statements and news coverage demonstrating that Defendants sought to dismantle USAID and other federal agencies and staff positions with a youthful workforce. FAC at ¶¶ 217-222, 228-230, 235-241, 254, 267-271. Plaintiffs, therefore, have alleged facts sufficient to show that USAID, as well as the State Department, OPM, OMB, and DOGE, proximately caused the age-based employment decisions that harmed Plaintiffs. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011) ("The decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes."); *McMunn v. Vill. of Quogue*, 2026 U.S. Dist. LEXIS 152132, *5-6 (E.D. N.Y. 2026) (quoting *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 656 (2020) ("There can be multiple but-for causes of a single employment decision.")).

In sum, Defendants' 12(b)(1) MTD asks this Court to dismiss Plaintiffs' claims arising out of the actions of the State Department, OPM, OMB, and DOGE, because Plaintiffs have failed to

allege facts that show that any of the named Defendants were directly involved with Plaintiffs' removal from USAID. As asserted herein, Plaintiffs' FAC alleges sufficient facts to show that all Defendants were involved in the process to remove Plaintiffs from USAID. Moreover, it is axiomatic that causation is a question of fact for a jury. *See McMunn*, 2026 U.S. Dist. LEXIS 152132, *5-6 (quoting *Bostock*, 590 U.S. at 656). As such, a causation-based dispositive motion at this point in the pleadings is premature. Thus, to the extent Defendants premise their MTD on the grounds that Plaintiffs have failed to allege sufficient facts establishing causation, denial of the motion is warranted.

**B. *Plaintiffs' adverse employment action claims are timely.***

As Defendants have alleged, Plaintiffs have bypassed the FSA's administrative process by filing suit against the heads of the discriminating agencies under the ADEA in federal court and by giving the EEOC at least thirty days' notice of the intent to file the lawsuit. *See* 29 C.F.R. § 1614.201(a); MTD at 10. This notice of intent to file must be delivered to the EEOC within 180 days of the occurrence of the unlawful practices at issue. *See* 29 U.S.C. § 626(d)(1)(A), 29 C.F.R. § 1614.201(a). Plaintiffs notified the EEOC on October 21, 2025, of their intent to bypass the EEOC's administrative process and file suit, and the Court has jurisdiction over claims arising between April 24, 2025, and October 21, 2025. MTD at 10; FAC at 24. Defendants have asserted that Plaintiffs' administrative leave began prior to April 24, 2025, and any claims arising from administrative leave are untimely.[5]

Although a short period of administrative leave with pay to allow for an investigation is

---

[5] As to Plaintiffs' ADEA claims arising out of the termination of their employment, Defendants have not and cannot assert that Plaintiffs' claims are untimely. The terminations occurred in the Summer of 2025; as such, to the extent Defendants terminated or caused to be terminated Plaintiffs' employment, Plaintiffs' claims are timely. To the extent Defendants have not raised the terminations as untimely, they have waived that argument.

typically not an adverse employment action, administrative leave that stretches out excessively without clear justification or an anticipated end date can rise to the level of an adverse employment action. *See Jones v. SEPTA*, 796 F.3d 323, 324 (3d Cir. 2015); *Dahlia v. Rodriguez*, 735 F.3d 1060, 1063 (9th Cir. 2013) ("placement on administrative leave can constitute an adverse employment action."); *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 891 (8th Cir. 2005); *Wevodau v. Pennsylvania*, 227 F. Supp.3d 404, 408 (M. D. Pa. 2017) (finding that paid administrative leave that persists for over a year with no given reason for the action and no anticipated duration can constitute an adverse employment action). Depending on the circumstances, involuntary administrative leave can range from a benign measure to one that stigmatizes an employee, causing significant emotional distress and harming opportunities for future advancement. *See Weveodau*, 227 F. Supp.3d at 408; *Stewart v. Miss. Transp. Comm'n*, 586 F3d 321, 332 (5th Cir. 2009) ("Placing an employee on paid administrative leave, however, cannot be said to be a 'petty slight.' . . . Forced leave may even affect an employee's opportunities for future advancement.").

Under the circumstances of Plaintiffs' administrative leave, they were given no reason for the leave and no anticipated duration. During the leave, Defendants made derogatory age-based statements about federal employees, in general, and USAID employees, specifically. As the administrative leave stretched out beyond early February 2025 for many Plaintiffs, Defendants cancelled some Plaintiffs' administrative leave and continued to place other Plaintiffs on leave from March 2025 through August 2025. By May 2025, Plaintiffs remained confused but began to recognize the administrative leave for what it was – an adverse employment action.

Indeed, Defendants' failure to notify Plaintiffs of the basis for their extended leave and to provide any guidance on how they could seek redress for being placed on leave, combined with

the lack of even providing Plaintiffs notice of who was placing them on leave, for what purpose and for what duration, suggest that the administrative leave was an adverse employment action. At the same time, the Agency abolished its Civil Rights Unit, marginalized its Employee and Labor Relations and Human Capital and Talent Management Offices, and provided no notice to the Plaintiffs of any rights they might have or how they could be exercised. Under these circumstances, blaming Plaintiffs for not comprehending their rights to challenge the involuntary administrative leave by some temporal limit seems self-serving and contrary to law.

Regardless, in discrimination cases, "administrative exhaustion requirements are not jurisdictional." *Niskey v. Kelly*, 859 F.3d 1, 7 (D.C. Cir. 2017); *see also Artis v. Bernanke*, 630 F.3d 1031, 1034 n.4 (D.C. Cir. 2011). In fact, untimely exhaustion of administrative remedies is an affirmative defense. As such, Defendants bear the burden of pleading and proving untimely exhaustion of administrative remedies. *See Rahimi v. Weinstein*, 271 F.Supp.3d 98, 102-3 (D. D.C. 2017). Moreover, "an employee who missteps in the [exhaustion] process may avoid dismissal if [s]he qualifies for equitable relief ... by demonstrating good cause for the procedural failure." *Niskey*, 859 F.3d at 7; *see also Rahimi*, 271 F.Supp.3d at 102-3 ("The administrative exhaustion requirement in Title VII cases may be excused for equitable reasons, including equitable estoppel."). When a defendant has taken active steps to prevent a plaintiff from litigating in time, equitable estoppel prevents a defendant from raising untimeliness. *See id.*

Given the chaos and uncertainty Defendants deliberately created around the administrative leave, assigning a date certain on which the administrative leave became an adverse employment action is difficult, if not impossible, by design. Appealing the action was rendered impossible by the Agency's conduct of abolishing its own Civil Rights Office, marginalizing its Employee and Labor Relations and Human Capital and Talent Management Offices, varying the administrative

leave itself, and providing no notice as to the basis for the leave, its duration, or how to appeal its impact. Plaintiffs, therefore, should not be barred from pursuing a cause of action arising out of the administrative leave because they did not file an EEOC notice within 180 days of the start of the leave.

Moreover, placement on administrative leave beyond the ten-day limit and subsequent termination is evidence of an ongoing investigation for disciplinary purposes and stigmatizes the affected employees. It also creates uncertainty, particularly under the circumstances that Plaintiffs have alleged, and creates a work environment in which Plaintiffs worry incessantly and are denied the ability to perform their duties and progress in their careers. As Plaintiffs have alleged, Defendants also publicly made age-based disparaging comments about Plaintiffs and career federal service employees. FAC at ¶¶ 219, 228.

Additionally, Plaintiffs have alleged OWBPA and ALA violations related to the manner in which Defendants carried out the RIF and DRP. FAC at ¶¶ 211, 226, 245, 263, 272-293, 305, 306, 317, 318, 345, 363, 375. When viewed together with Defendants' other actions, the OWBPA and ALA violations cumulatively show age discrimination and add to the Plaintiffs' evidence that Defendants' actions were designed to create a hostile work environment for ADEA-protected employees. *See Whitehead v. Oklahoma Gas & Elec. Co.*, 187 F.3d 1184, 1192 (10th Cir. 1999) ("The OWBPA does not, *by itself*, determine in the first instance whether age discrimination has occurred."). Under the circumstances Plaintiffs have alleged, their lengthy, *indefinite* administrative leave, coupled with derogatory age comments, denial of work and advancement opportunities, OWBPA and ALA violations, and terminations, amounted to a hostile work environment and/or constructive discharge based on age. *See Roberson v. Snow*, 404 F.Supp.2d 79, 97 (D. D.C. 2005).

Under the continuing violation doctrine, a hostile work environment is comprised of a series of separate acts that collectively amount to an unlawful employment practice. *See Alberti v. District of Columbia*, 2026 U.S. Dist. LEXIS 152132, *20 (D. D.C. 2026). This is "because the 'very nature' of a hostile environment claim 'involves repeated conduct,'" and incidents that amount to a hostile work environment occur over time, which starts the clock anew. *King v. Aramark Servs.*, 96 F.4th 546, 559-60 (2d Cir. 2024); *see Reeve v. Monex Inc.*, 2024 U.S. Dist. LEXIS 133053, *20 (D. D.C. 2024) (citing *Vickers v. Powell*, 493 F.3d 186, 198 (D.C. Cir.)). As such, Plaintiffs' claims arising before April 24, 2025, including claims arising from the extended administrative leave, are timely.

Finally, Plaintiffs allege that the Agency itself abolished its own Employee and Labor Relations and Human Capital and Talent Management Offices and left Plaintiffs with no avenue to obtain information about the administrative leave, to discuss or assert their claims. FAC at ¶¶ 299, 322. Additionally, when conducting its RIF, the Agency failed to notify Plaintiffs of their rights to challenge the RIF on EEO or age-related grounds. This dismantling of the offices that could have assisted Plaintiffs with their claims and the lack of notice that complied with OWBP should bar Defendants from asserting that Plaintiffs failed to timely file their notices with the EEOC.

## II. Plaintiffs have stated claims as to all counts under Fed. R. Civ. P. 12(b)(6).

### *A. Plaintiffs have made a plausible disparate treatment ADEA claim in Count One.*

In Count One, Plaintiffs have alleged ADEA age-based disparate treatment in that Defendants treated them less favorably because of their age. The ADEA shields federal employees "from any discrimination based on age." 29 U.S.C. § 633a(a); *see also Breen v. Chao*, 253 F.Supp.3d 244, 253-254 (D. D.C. 2017). The facts in Plaintiffs' Complaint, taken as

true, establish disparate treatment that violated the ADEA.

Plaintiffs have alleged that to carry out its mission, "USAID has relied on its foreign service workforce *which is primarily made up of workers over the age of 40*, by some estimates, more than 89 percent." FAC at ¶ 15 (emphasis added). USAID terminated these older foreign service officers *en masse*, or in a large group. Thus, USAID's agency-wide removal of its foreign service officers amounts to age-based discrimination, given the older demographic of the foreign service officers. Put another way, Defendants tailored the pretextual RIF so that it would impact older USAID employees.

Defendants mistakenly claim that dismissal is appropriate in the instant case because "a plaintiff must *prove* that age was the 'but-for' cause of the employer's adverse action." MTD at 12 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)) (emphasis added). The question presented in the case upon which Defendants rely, however, was "whether a plaintiff must present direct evidence of age discrimination in order to obtain a mixed-motives *jury instruction* in a suit brought under the Age Discrimination in Employment Act of 1967 . . . ." *Id.*, at 169-170. Unlike the case upon which Defendants rely, the procedural posture of this case is a pending Rule 12(b)(6) motion prior to discovery and long before Plaintiffs must prove anything at trial.[6]

At the Rule 12(b)(6) stage of litigation, Plaintiffs must be granted "the benefit of all inferences that can be derived from the facts alleged." *Ctr. for Biological Diversity*, 369 F.Supp.3d at 172; *see also Sparrow* , 216 F.3d at 1113; *Am. Nat'l Ins. Co.*, 642 F.3d at 1139. The Court, therefore, must treat Plaintiffs' factual allegations as true and grant Plaintiffs the benefit of all reasonable inferences. *See Gilvin*, 259 F.3d at 756 (quoting *Sparrow*, 216 F3d at

[6] This *McDonnell Douglas* burden shifting analysis is inappropriate at this stage of litigation and should be reserved for trial or a summary judgment motion pursuant to Rule 56 at the close of discovery.

1114.

Plaintiffs have alleged that they are all over 40, that the vast majority of USAID's foreign service officers are over the age of 40, that Defendants failed to comply with the OWBPA, and that Defendants terminated the employment of USAID's foreign service officers together in a large mass. These facts alone show that the pretextual RIF amounted to age-based disparate treatment. Moreover, Defendants' widespread comments related to age "create a genuine issue of material fact concerning pretext that only a factfinder can make." *Breen*, 253 F.Supp.3d at 260.

Plaintiffs' FAC also cites Defendants' public statements displaying age-based animus that belie Defendants' claims that "the RIFs affected all USAID employees, regardless of age, such that Plaintiffs' age was not the 'but-for' cause of their removals." MTD at 1-2. While courts in the past have afforded such claims a presumption of regularity, courts have become more reluctant to do so since 2025. *See In Re: Administrative Subpoena 25-1431-032 to Rhode Island Hospital*, C.A. No. 1:26-mc-0007-MSM-AEM, 2026 U.S. Dist. LEXIS 106783, 2026 WL 1463692 at *2-3( D. R.I. May 14, 2026) ("The Court cannot help but share the sentiment that '[t]he presumption of regularity that has previously been extended to [DOJ] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds.'") (quoting *United States v. Oregon*, No. 6:25-CV-01666-MTK, 2026 U.S. Dist. LEXIS 25259, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026)). Indeed, this Court has noted that "[g]enerations of presidential administrations and public officials have validated this underlying premise of the presumption of regularity: their actions writ large have raised little question that they act 'in obedience to [their] duty.' Over the last six months, however, courts have seen instance after instance of departures from this tradition." *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 92

(D. D.C. 2025) (internal citations omitted). Defendants have argued that "Plaintiffs were employees of USAID who were placed on paid administrative leave and eventually removed as part of USAID agency-wide RIFs to wind down programmatic activity at the agency and transfer its programmatic functions to the State Department. Plaintiffs were not individually targeted for dismissal, nor broadly targeted as a group, because of their age." MTD at 2-3. Given the loss of confidence in Executive Branch statements, such unsupported claims by Defendants should not be afforded any weight. As such, dismissal of Count One at this early stage of litigation is not appropriate.

***B. Plaintiffs have set forth plausible disparate impact ADEA claims in Count Two.***

In Count Two, Plaintiffs claim that Defendants intentionally violated the ADEA, resulting in a significant disparate impact on an age-based protected class. The ADEA prohibits age-based practices and policies that have a disparate impact on an ADEA protected class. *See* 29 U.S.C. § 633a(a); *Breen*, 253 F.Supp.3d at 253-254. Plaintiffs have isolated and identified the employment practices that are specifically responsible for the disparate impact – the lengthy administrative leave, the pretextual RIF, DRP, and termination of Plaintiffs' employment. *See id*. at 265 (quoting *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005)).

As an initial matter, Defendants have been opaque as to the demographics of USAID employees affected by the RIF resulting in a dearth of statistical data on the RIF. To the extent Plaintiffs' FAC relies on information and belief, "[w]hen the information necessary to establish standing is in Defendants' control, courts permit pleadings on information and belief accompanied by facts upon which the allegations are based." *See Kareen*, 986 F.3d at 866. Plaintiffs have cited to the lengthy administrative leave executed in violation of the ALA, disparaging age-based comments, OWBPA violations, hiring of younger replacement employees,

and pretextual RIF as facts that show the Defendants deliberately designed the RIF to disproportionately affect USAID foreign service officers who are generally older. FAC at ¶¶ 15, 16, 282, 283, 286-296. As such, Plaintiffs have met their burden under Rule 12(b)(6) to show the pretextual RIF had a deliberate disparate impact on older USAID employees, in violation of the ADEA.

Count Four alleging an ADEA violation due to unlawful classification has merit.

To the extent Defendants' actions and policies can be considered facially neutral employment practices, the actions and practices have operated to exclude or adversely affect a disproportionate amount of protected older employees. Unlike the discriminatory pretexual RIF argument in Section IIB, *supra*, Plaintiffs need not set forth facts to prove discriminatory intent. *See Arnold v. U.S. Postal Svce,*, 863 F.2d 994, 998 (D.C. Cir. 1988); *Leftwich v. Harris-Stowe State College*, 702 F.2d 686, 690 (8th Cir. 1983); 29 U.S.C. § 623(a)(1). Rather, Plaintiffs must isolate and identify the specific employment practice that caused any statistical disparities. Thus, to establish a *prima facie* case of age discrimination unlawful classification disparate impact theory, Plaintiffs must "only demonstrate that a facially neutral employment practice actually operates to exclude from a job a disproportionate number of persons protected by the ADEA." *Leftwich*, 702 F.2d at 690.

As set forth above, Plaintiffs' Complaint alleges that USAID's foreign service workforce is made up primarily of employees over age forty who comprise, by some estimates, more than eighty-nine percent of the USAID workforce. FAC at ¶¶ 15, 28-203. Given this fact, Defendants' actions, even if not deliberately designed to affect older adults, disproportionately affected a large number of ADEA-protected USAID employees. As such, dismissal is inappropriate because Plaintiffs have made a *prima facie* showing that Defendants' employment practices operated to exclude from USAID a disproportionate number of ADEA-protected

employees.

***C. Count Five states a Constructive Discharge claim under the ADEA.***

As to Plaintiffs' claims of constructive discharge through intolerable conditions in violation of the ADEA, Defendants assert that "Plaintiffs do not plausibly allege specific facts as to any intolerable conditions that plaintiffs King and Pagen experienced leading to their resignations . . . ." As such, Defendants characterize Plaintiffs' allegations as threadbare and conclusory" and claim that they "do not meet the plausibility bar of *Twombl*y." MTD at 15. Defendants must be reading a different complaint than the one Plaintiffs have brought. As discussed *infra*, Section I, Plaintiffs have alleged substantial facts that show Defendants deliberately created a hostile work environment designed to cause ADEA-protected employees to depart USAID.

The removal of Plaintiffs from the workplace, the indefinite administrative leave, the denial of access to that workplace or the ability to perform any duties, the refusal of Defendants to apprise Plaintiffs plainly of the basis of their decisions, who made them, or how to address them, was and is clearly a hostile work environment. Indeed, it should be noted that Defendants' comments and actions appeared specifically designed to convince Plaintiffs that they would be terminated and had no recourse. The specific citation to age as a basis for these actions cements the hostility. And the denial of any work functions, that is the denial of any actual work environment, was clearly hostile, retaliatory,[7] and designed to enforce upon Plaintiffs the notion that they should quit or suffer ultimate termination. Indeed, the DRP was a false flag designed to make them quit and was specifically targeted at senior workers. The procedural abuses attendant with the RIF, a process specifically designed to protect seniority and institutional knowledge were also cast aside. Only a contorted and fabulist version of events could support a contention

[7] Defendants have not challenged whether the Defendants' actions were retaliatory and have, thus, conceded that they were retaliatory.

that the Plaintiffs have not amply alleged their claims.

In sum, the OWBPA violations, *indefinite* administrative leave in violation of the ALA, disparaging age comments, denial of work and advancement opportunities, and unceremonious terminations created an environment hostile to ADEA-protected employees. As such, dismissal of Plaintiffs' ADEA claims in Count Five is not appropriate at this early stage of litigation.

***D. Count Three states a claim under the OWBPA.***

Defendants assert that "Plaintiffs cannot avail themselves of a private right of action to enforce OWBPA in this suit[ ]" because Congress did not create "a private right of action to rectify any OWBPA violation." MTD at 14. While Congress may not have created an *independent* private right of action when it enacted the OWBPA amendments to the ADEA, it did allow for a cause of action, brought as a part of a larger ADEA claim, seeking declaratory judgment voiding a waiver that violates the OWBPA. *See Whitehead*, 187 F.3d at 1192 ("Since Appellants have not asserted a separate ADEA claim, we conclude that the district court properly dismissed Appellants' claim that a violation of the OWBPA, by itself, establishes age discrimination."); *Larsen v. Simonds Indus.*, 227 F.Supp.2d 331, 337 (D. Ma. 2004) (noting that "a plaintiff who has signed a waiver that violates the OWBPA may be entitled to declaratory judgment voiding such a waiver."); *Peterson v. Seagate US LLC*, 2007 U.S. Dist. LEXIS 85873, *8 (D. Mn. 2007) (holding that "[t]he Complaint contains sufficient allegations that the releases at issue are not valid under OWPBA and that plaintiffs signed the releases under duress.")). Plaintiffs have alleged that any waivers executed in connection with the involuntary, pretextual RIF, the DRP, retirement, and/or any other termination associated with the instant case were invalid and, thus, unenforceable. *See Anzueto v. Wash. Metro. Area Transit*, 357 F.Supp.2d 27, 32 (D. D.C. 2004) ("Congress, by passing OWBPA, has specifically provided that an individual

may not waive a right or claim under ADEA unless it is knowing and voluntary.”).

Defendants also argue that the OWBPA only affects employees who resigned and were not terminated pursuant to the pretextual, involuntary RIF. MTD at 13. The OWBPA, however, applies to involuntary RIFs, as well as exit incentives or employment termination plans such as the DRP. *See Campbell v. Amana Co., L.P.*, 125 F.Supp.2d 1129, 1134 (D. Ia. 2001) (“Although this circuit has not addressed the issue, other courts have construed the OWBPA’s inclusion of ‘other group termination program[s]’ to encompass reductions in force, determining that such a construction is in accord with the legislative history.”) (“this Court has been unable to find, nor have Defendants proposed, a single case in which a large-scale RIF was deemed exempt from the additional affirmative duties of subsections ‘(F)(ii) and ‘(H).”)). The OWBPA and its implementing regulations demand that employers provide decisional unit statistics and criteria. *See* 29 C.F.R. § 1625.22(f)(3)(ii)(A). Plaintiffs have alleged that Defendants State Department and USAID failed to publish or otherwise provide any such decisional unit data related to involuntary, pretextual RIF, in violation of the OWBPA.

As set forth in paragraph B of the FAC’s Prayers for Relief, Plaintiffs seek to enjoin Defendants from enforcing Plaintiffs’ unlawful terminations, which includes declaring unenforceable any waivers signed in violation of the OWBPA and declaring the RIF unlawful for failure to comply with the OWBPA’s data publication requirements and other requirements. FAC at 124. Such equitable relief is available in an ADEA case that alleges related OWBPA violations. *See Oubre v. Entergy Operations*, 522 U.S. 422, 428 (1998) (“As a statutory matter, the release cannot bar her ADEA suit, irrespective of the validity of the contract as to other claims.”); *Newman v. D.C. Courts*, 125 F. Supp. 3d 95, 106 (D.C. Cir. 2015) (“at a minimum, the OWBPA prevents an employer from invoking a release or waiver of an ADEA claim that does

not comply with the OWBPA.") (citing to *Oubre*, 522 U.S. at 426-27); *Whitehead*, 187 F.3d at 1192. As such, dismissal of Plaintiffs' OWBPA claims in Count Three for failure to state a claim is inappropriate at this stage of litigation.[8]

***E. Count Six alleging a violation of the ALA both sets forth a cause of action and is Independent Evidence of Discrimination, Retaliation, and Reprisal.***

Defendants have asserted that the ALA creates no independent right of action and that the ALA's ten-day administrative leave limit applies only to investigative leave.[9] Defendants, therefore, seek dismissal of Plaintiffs' ALA claims. Plaintiffs, however, have pled the ALA claim as part of their ADEA claim because the lengthy, unlawful administrative leave altered the terms and conditions of their employment. This is a case of first impression.

As alleged in Plaintiffs' FAC, the Executive Branch, broadly, and OPM, specifically, acted *ultra vires* and in violation of the ALA when it placed Plaintiffs on administrative leave that far exceeded ten-days. In passing the ALA of 2016, Congress expressed its sense that the use of administrative leave "has exceeded reasonable amounts . . . resulting in significant cost to the Federal Government." Pub. L. No. 114-328, 130 Stat. 2461 (1961). Congress, therefore, indicated that "administrative leave should be used sparingly[.]" Pub. L. No. 114-328, 130 Stat. 2461 (1961). Thus, in enacting the ALA of 2016 Congress curtailed administrative leave usage by limiting it to no more than 10 work days per calendar year. *See* 5 U.S.C. § 6329a.

The implementing regulations permit administrative leave only when the absence is directly related to the agency's mission, when the agency officially sponsors or sanctions the absence, when the absence will clearly enhance the professional development or skills of the employee in

---

[8] To the extent the Court may find the FAC does not allege a cause of action arising from Defendants' OWBPA and ADEA violations, the remedy is not dismissal but rather amendment of the FAC.

[9] To the extent the Court may find that Plaintiffs have no cause of action under the ALA, the remedy is to allow amendment of the FAC to plead an ADEA claim stemming in part from the Defendants' improper use of administrative leave that altered the terms and conditions of Plaintiffs' employment.

the employee's current position, or the absence is in the interest of the agency or the Government as a whole. *See* 5 C.F.R. § 630.1403. An absence satisfies one of these conditions if the absence is "[p]ermitted under written agency policies (established by the head of the agency or by other agency officials under a specific delegation of authority); . . . or [r]eviewed and approved by an official of the agency who is (or is acting) at a higher level than the official making the determination, if the specific type of use and amount of leave for that use has not been authorized under established written policy . . . ." 5 C.F.R. § 630.1403.

This extended, indefinite administrative leave came at significant cost to the Government, did not relate to the agency's mission, did not enhance the employees' professional development or skills in their current positions, was not in the interest of agency or Government, and was not officially sponsored or sanctioned by the agency. Rather, the administrative leave targeted older, ADEA-protected employees and altered the terms and conditions of their employment. Specifically, Plaintiffs were barred from working and further developing their skills. As such, the administrative leave constituted an adverse employment action that was taken against ADEA-protected individuals.

Despite what Defendants have asserted, the ALA's ten-day limit applies to *all* administrative leave, which includes, but is not limited to, investigative leave. Plaintiffs bring their complaint pursuant to the ADEA and have alleged that Defendants' ALA violations have harmed Plaintiffs. Specifically, administrative leave in excess of ten days carries the stigma of disciplinary action. The lengthy administrative leave is, on information and belief, in Plaintiffs' personnel files and suggests that Plaintiffs were on leave due to an investigation or other disciplinary issue. Plaintiffs' FAC, therefore, seeks an order compelling Defendants to update Plaintiffs' personnel records to reflect that the administrative leave and related terminations were not performance- or

conduct-based.

### *F. Count Seven states a claim under the APA.*

Plaintiffs' FAC asserts claims pursuant to the APA, which allows courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . . without observance of procedure required by law." 5 U.S.C. §706(2)(D). Plaintiffs have pled that USAID's decision to place them on involuntary administrative leave and then terminate their employment is a final agency action that is subject to APA review. USAID's decision marks the consummation of its decision-making process and affects Plaintiffs' rights, from which "legal consequences" flow. FAC at ¶ 414 (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

The APA "allows any person aggrieved by agency action to challenge that action as 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Lucas v. AFGE*, 151 F.4th 370, 384 (D.C. Cir. 2025) (quoting 5 U.S.C. §706(2)(A)). A reviewing court must "set aside agency action that is found to be 'arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law.'" *Cigar Ass'n of Am. v. U.S. Fed. & Drug Admin.*, 964 F.3d 56, 61 (D.C. Cir. 2020) (quoting 5 U.S.C. §704). Under this standard, an agency must engage in reasoned decision-making and "reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach." *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.,* 972 F.3d 83, 115 (D.C. Cir. 2020) (citing *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020)). Thus, the APA waives the United States' sovereign immunity for a claim arising out of a federal agency's action (1) that does not seek monetary damages, (2) that has no other adequate remedy, and (3) that seeks relief that is not expressly or impliedly forbidden by another statute. *See* 5 U.S.C. §§702, 704; *Cigar Ass'n of Am.*, 964 F.3d at 61. The federal agency's action must be a final decision from which legal consequences flow.

*See Bennett*, 520 U.S. at 177-78; *Cigar Ass'n of Am.*, 964 F.3d at 61.

As previously noted, Defendants marginalized and essentially neutered USAID's Employee and Labor Relations and Human Capital and Talent Management Offices and left Plaintiffs with no avenue to obtain information about the administrative leave, the RIF, the DRP, or to discuss or assert their claims. FAC at ¶ 322. Similarly, Defendants failed to notify Plaintiffs of their rights to challenge the RIF on EEO or age-related grounds and failed to provide notices that complied with the OWBP. These actions have frustrated the administrative process through which Plaintiffs could have sought relief or assistance. Having dismantled the entities that could have provided an adequate remedy, Defendants should not now be permitted to argue that Plaintiffs' APA claims fail because there are other adequate remedies to Plaintiffs. *See Powell v. Omnicom*, 497 F.3d 124 (2d Cir. 2007); *Burlison v. McDonald's Corp*., 455 F.3d 1242 (11th Cir. 2006); 29 U.S.C. § 626.

Finally, the claims in Plaintiffs' FAC challenge not only their lengthy administrative leave and terminations but also seek relief for the effects Defendants' actions have had on Plaintiffs' personnel records. Specifically, personnel records that contain lengthy, unlawful administrative leave followed by a termination suggest that the individual engaged in some misconduct or had performance issues. Plaintiffs, however, had no performance issues and engaged in no misconduct. Rather, they were victims of a regime bent on removing ADEA-protected USAID employees. As a result of Defendants' arbitrary and capricious actions, Plaintiffs were placed on a lengthy administrative leave, in violation of the ALA, and then terminated without following the mandatory provisions of the OWBPA. Defendants argue that Plaintiffs have no independent cause of action under the ALA and OWBPA; assuming, *arguendo*, that Defendants are correct, Plaintiffs seek equitable relief under the APA to ensure their personnel records accurately reflect

their honorable service and contain no stigmatizing records. The APA provides the exclusive avenue for judicial review of actions taken in violation of the ALA and OWBPA when they are final, non-discretionary, and cause cognizable injury.

## CONCLUSION

Defendants' Motion to Dismiss is little more than an argument not over the matters pled but the sufficiency of the facts. Defendants invite the Court to render an opinion on the sufficiency of the evidence itself; such an overture should be rejected. Additionally, to the extent there are any infirmities to the First Amended Complaint, the proper remedy is not dismissal but allowing Plaintiffs the opportunity to amend their filing. Plaintiffs request oral argument on this motion.

Dated: August 6, 2026

Respectfully submitted,

*/s/ Kevin E. Byrnes*

Kevin E. Byrnes, Esq.
Patriots Law Group of Lyons & Hughes, P.C.
2760 Eisenhower Ave., Suite 250
Alexandria, Virginia 22314
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 6th day of August, 2026, a copy of the foregoing was sent via electronic mail and filed via ECF to:

Esam K. Al-Shareffi
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Esam.k.al-shareffi@usdoj.gov

/s/ Kevin E. Byrnes
Kevin E. Byrnes, Esq.
Patriots Law Group of Lyons & Hughes, P.C.
2760 Eisenhower Ave., Suite 250
Alexandria, Virginia 22314
*Attorneys for Plaintiffs*